## DIN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Toby D. Boles, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) | **AND DENYING PLAINTIFF'S MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | Case No. 1:10-cv-071 |
| | ) | |
| Defendant. | ) | |

The plaintiff, Toby D. Boles ("Boles"), seeks judicial review of the Social Security Commissioner's denial of his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433, and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et. seq*.

## I.     BACKGROUND

### A.     Procedural History

Boles filed applications for DIB and SSI on August 6, 2007, alleging that he has been disabled since October 5, 2004.  (Tr. 266-80).  His applications were denied initially and upon reconsideration. (Tr. 163-67, 173-77).  At his request, an administrative law judge (ALJ) convened a hearing on October 29, 2009.  (Tr. 28-145. 147).

The ALJ issued his written opinion on November 13, 2009. (Tr. 10-22).  Therein he concluded that Boles was not disabled as defined by the applicable regulations and therefore entitled to neither DIB nor SSI.  (Tr. 10-22).  Dissatisfied, Boles requested a review of the ALJ's decision

with the Appeals Council.  (Tr.146-48, 168, 438-40).  Upon completion of its review, the Appeals Council adopted the ALJ's decision as the Commissioner's final decision.  (Tr. 1-6).

Boles initiated the above-captioned action on September 17, 2010, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  See Docket No. 1.  He filed a Motion for Summary Judgment on January 1, 2011.  See Docket No. 13.  The Commissioner filed his own motion for summary judgment on February 11, 2011.  See Docket No. 16.  Both motions have now been fully briefed and are ripe for consideration.

### B.    General Background

Boles was born on November 25, 1957. (Tr. 34).  He was 51 years at the time of his administrative hearing.  (Id.).  He has a GED.  (Tr. 365, 375).   He served in the United Army from 1976 until 1979.  (Tr. 39).  In the fifteen years preceding the alleged onset of his disability, he labored in construction industry, was briefly employed as a deburrer, traveled with a carnival, sold windows and siding, and worked for a mortgage broker.  (Tr. 325, 398-404, 435).  In 2005, he worked very briefly as a wire harness assembler for Killdeer Mountain Manufacturing and heavy equipment operator for Morris, Inc.  (Tr. 49-53).  In 2006, he stacked bricks for Hebron Brick. (Id.).  In 2008, he sold some scrap metal for approximately $1,200.  (Id.).  He has not engaged in anything that would qualify as substantial gainful activity since October 5, 2004, however.  (Tr. 12).  By his estimate, he owes between twenty-five and thirty thousand dollars in child support.  (Tr. 55).

At the time of the administrative hearing Boles was living with his fiancé and her two children in Hebron, North Dakota.  (Tr. 35).  The four of them were subsisting largely on food stamps, fuel assistance, and his fiance's SSI benefits.  (Tr. 42-43, 45).

2

Boles has a history of hepatitis C, coronary artery disease, bradycardia, degenerative disc disease, dyslipidemia, bilateral sacralization with moderate to significant disc space narrowing at L5-S1, a medial collateral ligament strain and torn medial meniscus in his left knee, and bilateral rotator cuff tears.  He also suffers from depression, anxiety, post traumatic stress disorder, and an avoidant personality disorder.  (Tr. 91-93).  He has been prescribed Zanex, Zoloft (or its generic equivalent), Lisprinol, Plavix, Meditropinol, Lexapro, Lipitor, and nitroglycerin.  (Tr. 45, 98-100, 472).  However, he maintains that he cannot afford to have all of these prescriptions filled and is largely reliant upon the samples given to him by his physicians.  (Tr. 47, 319).

Boles complains of numbness in his legs as well as chronic back, knee, hip, sciatic, testicular, neck, and chest pain.  (Tr. 79, 83, 170, 322, 397, 465-66).  On a scale of one-to-ten, he rates his pain as an eight plus.  (Tr. 85, 322, 465-66).  Although he has at various times been prescribed Tylox, hydrocodone, Toradol, Demerol, and morphine for his pain, he relies primarily on over-the-counter painkillers (read: ibuprofen, naproxin, and aspirin) as well as hot showers for pain relief.  (Tr. 47, 85).  He insists that his usage of over-the-counter painkillers is borne in part out of necessity as he has no health insurance and cannot afford his prescribed pain medication.  Moreover, he reportedly does not like taking prescription pain medication unless absolutely necessary on account of their side effects, which include: night sweats, trouble urinating, constipation, dry mouth, dizziness, blurred vision, and fatigue.  (Tr. 49, 87).

Boles is a heavy smoker and admitted binge drinker.  (Tr. 95).  He also has "a prior history of cocaine, methamphetamine, marijuana, and acid use."  (Tr. 667).[1]

---

[1] On April 26, 2006, an SSA consulting clinical psychologist interviewed Boles.  (Tr. 480-86).  According to his report, Boles admitted in the interview to having experimented with PCP, methamphetamine, cocaine, hasish and LSD in his youth. (Tr. 481-82).

Although he tries to pitch in around the house, Boles insists that his physical and mental impairments prevent him from doing too much. (Tr. 320). He cooks, cleans, folds laundry, and shops for groceries, albeit on a limited basis. (Tr. 391-32). However, he no longer feels capable of performing yard work. (Id.). And by his estimation he can stand for no more than thirty minutes at a time and lift no more than ten pounds. (Tr. 90-91).

### C.    Medical Records

Boles sought treatment from Dr. Robert Cusic on September 23, 2003 for a back injury that he had sustained in a workplace slip and fall accident. (Tr. 474, 540). He returned to Dr. Cusic on November 24, 2003, with complaints of continued back pain. (Tr. 547). According Dr. Cusic's notes, Boles exhibited some mild to moderate muscle spasms as well as degenerative disc changes of L4-5 through L5-S1. (Tr. 547). Dr. Cusic placed Boles on Tylox, advised him to avoid heavy exertion, and arranged for a specialist consultation on his back. (Tr. 547-48).

On December 2, 2003, Boles presented to nurse practitioner Kevin Chausee of the Bone and Joint Center with complaints of severe back, buttock and leg pain. (Tr. 512). Chausee initially observed that, pain complaints aside, Boles appeared quite healthy. (Id.). Upon further examination, Chausee noted that Boles was experiencing severe spasm in the muscles adjacent to his spinal column and that x-rays had revealed degenerative changes to the lower two levels of his lumbar spine. (Id.). Diagnosing Boles with low back pain and degenerative disc disease, Chausee prescribed Boles Vicodin and Flexeril (a muscle relaxant), administered lumbar epidural injections, referred him to physical therapy, and recommended that he refrain from work for one month. (Tr. 513).

4

On December 2, 2003, Chausee issued a "Worker's Compensation Report" on Boles' behalf. (Tr. 531). Therein he stated that Boles was suffering from a temporary disability and was not to work for at least one month. (Id.). However, in closing, he indicated that Boles' prognosis was good. (Id.)

Boles was evaluated by physical therapist Tom Henke on December 11, 2003. (Tr. 474-77, 516-519, 532-35). During the evaluation, Boles advised Henke that: (1) his condition worsened when bending, sitting, or lying down; (2) his condition improved when stranding or otherwise on the move; and (3) he was having difficulty sleeping on account of his pain. (Id.). Setting a goal to improve Boles' general condition, Henke crafted a plan calling for Boles to participate in therapy three times per week. (Id.).

Boles reported for physical therapy on December 11 and 17, 2003. (Tr. 536-538). However, it appears that he was formally discharged physical therapy on January 7, 2004, after be began cancelling or otherwise failing to report for treatments as scheduled. (Tr. 478-79, 537-38).

Boles underwent an MRI on his lumbar spine on January 14, 2004. (Tr. 528). According to the radiologist's report, the MRI showed spondylosis greatest at L5-S1 but not no stenosis. (Id.).

Boles returned to Chausee on January 16, 2004. (Tr. 514). In his examination notes, Chausee indicated that Boles was not a good surgical candidate because: (1) he had not been given enough time to see if his condition would resolve on its own; and (2) he was taking too much narcotic pain medication (oral Demoral) secondary to his dental issues. (Id.). Chausee advised Boles to work with Dr. Cusic to wean himself off of the narcotic pain medication, quit smoking, and participate in physical therapy. (Tr. 514-15). Chausee added that Boles would be referred for a

surgical evaluation if, in six weeks, he had ceased smoking, changed his medication, and yet still suffered from severe back pain. (Id.).

On February 24, 2004, Boles contacted Dr. Cusic to request prescriptions for hydrocodone and cyclobenzaprine. (Tr. 546). This apparently was not the first time that Boles had contacted Dr. Cusic requesting medication. (Id.). According to the physician's notes, Dr. Cusic refused to dispense hydrocodone to Boles. In so doing, he advised Boles that any such narcotics would have to come from either Boles' chronic pain management doctor or back doctor. (Id.). He did, however, provide Boles with a thirty-day supply of cyclobenzaprine. (Id.).

Two days later, on February 26, 2004, Boles presented to Dr. Dennis Wolf, complaining of chronic back pain and requesting prescription painkillers. (Tr. 545). Dr. Wolf provided Boles with a twelve to fourteen day supply of Amitroptyline and Lorcet. (Id) Dr. Wolf also visited with Boles about the use of prescription medication for chronic pain management. (Id.).

Boles apparently made an appointment to see Dr. Wolf on March 12, 2004. (Tr. 544). He failed to keep the appointment, however. (Id.). In noting Boles' absence, Dr. Wolf expressed the need to get Boles back to Vocational Rehabilitation. (Id.).

Boles returned to Dr. Wolf on December 27, 2004, complaining about chronic back pain, chest pain, numbness and weakness in his lower extremities, difficulty walking and maintaining his balance, fatigue, insomnia secondary to pain, blurred vision, occasional dysophagia, indigestion, and intermittent testicular pain. (Tr. 541). In his notes, Dr. Wolf mentioned that Boles had gone to Bismarck for pain management, was no longer taking any prescription medication, and that the ibuprofen he had been taking for pain had helped. (Id.). Dr. Wolf further observed that Boles had some difficulty getting out of his chair and standing up, needed to be assisted on to the examination

table, and struggled a bit when dressing himself at the examination's conclusion. With respect to Boles' physical condition, Dr. Wolf noted that the Boles' left calf had atrophied, that his range of motion appeared to be limited on account of his pain, and that there was "decreased pinprick and tactile sense on [his] left lateral leg and some degree on the right." (Tr. 542-43). In conclusion, Dr. Wolf opined that Boles was permanently disabled but should still submit to a functional capacity assessment for completeness (Id.).

Boles presented to the emergency room on January 28, 2005, complaining of pain and swelling in his jaw. (Tr. 524). He was diagnosed with dental abscesses and right hemifacial cellulitis, for which he was intravenously given Ancef and Toradol. (Tr. 524-25). Upon discharge, he was prescribed Keflex and Tylox. (Tr. 525). He was also encouraged to follow up with a dentist. (Id.)

On March 30, 2005, Boles sought treatment from Teresa Neilson, a physicians assistant, for insomnia secondary to his complaints of back pain. (Tr. 488, 616). When summarizing her impression of Boles, Neilson was careful to note that, although Boles had attributed his insomnia to his ongoing back issues, he "really [was] not coming for the pain." (Id.). Neilson prescribed Ambien to Boles for his insomnia. (Id.). She also instructed Boles to continue taking ibuprofen for his back pain. (Id.).

Boles presented to the emergency room on June 15, 2005, with complaints of severe pain on the left side of his chest. (Tr. 491-94, 618-20). His initial EKG was unremarkable. (Id.). His chest x-rays were normal. (Tr. 503). He was nevertheless admitted to intensive care by the attending physician, Dr. Radu Rauta, and started on an anticoagulant, beta-blockers, and nitroglycerin. (Tr. 491-94, 618-20).

Dr. Rauta discharged Boles from the hospital on June 15, 2005, with the following medications: Zoloft, Lipitor, and aspirin.  (Tr. 494).  According to Dr. Rauta's discharge summary, a Cardiolite treadmill stress test and electrocardiogram performed on Boles had not revealed any appreciable changes and that three sets of cardiac enzymes tests had conclusively ruled out a miocardial infarction.  (Tr. 494).

On June 23, 2005, Boles returned to the hospital for a followup examination.  (Tr. 488, 616-17).  He reported having an episode of chest pain, which Dr. Rauta suspected was most likely triggered by anxiety.  (Id.).  Dr. Rauta instructed Boles to continue taking Zoloft and Lipitor. (Id.). In addition, Dr. Rauta prescribed Alprazolam to Boles for his anxiety.  (Id.).

On October 20, 2005, Boles apparently slid off of a roof on which he had been working and fell twelve to fifteen feet to the ground below.  (Tr. 468, 495-96, 622-23).  Although he was able to bear his weight and continue working, he later developed stiffness and pain in his left leg and knee. (Id.).

On October 23, 2005, Boles presented to the emergency room seeking treatment for his left knee pain. (Id.).  Dr. Kent Hoerauf fitted him with a full length knee immobilizer, gave him Darvocet for the pain, advised him to supplement the Darvocet with ibuprofen, and scheduled an MRI.  (Tr. 468).

Boles underwent an MRI on November 7, 2005. (Tr. 471, 506).  The MRI revealed that he had torn the medial meniscus in his left knee, strained the medial and anterior cruciate ligaments in his left knee, and likely bruised his bone.  (Id.).

Boles returned to the West River Regional Medical Center for a followup exam with Dr. Hoerauf on November 10, 2005.  (Tr. 470, 490, 617).  According to the treatment notes, Boles

reported that his condition made it difficult to continue his construction/roofing work.  (Tr. 470).

Specifically, he complained that he had trouble walking on rooftops and negotiating ladders.  (Id.).

Noting the absence of effusion to the joint or peripheral edema, Dr. Hoerauf referred Boles to

physical therapy and started him on 800 milligrams of ibuprofen three times a day. (Id.).  That same

day Dr. Hoerauf apparently advised Workforce Safety and Insurance that Boles could return to light

work.  (Tr. 442).

On January 2, 2006, Boles presented to the emergency room, complaining that pain was

intermittently radiating through the left side of his chest and down his arm.  (Tr. 497, 624-26).  The

attending physician, Dr. Laura Walker, reported that, although Boles admittedly used  alcohol on a

regular basis and engaged in high risk cardiac behavior such as smoking one pack of cigarettes per

day, his past medical history was fairly unremarkable, his EKG appeared normal, and his vital signs

were stable.  (Tr. 497-99).  Dr. Walker, nevertheless admitted Boles to the hospital and started him

on oxygen, morphine, and nitroglycerin.  (Tr. 498).

Boles was subsequently subjected to a physical stress test and myocardial perfusion scan,

neither of which revealed any abnormalities.  (Tr. 508, 638-39, 642).

Dr. Rauta examined Boles on January 3, 2006.  (Tr. 501-04, 628-32).  He noted that, while

Boles' EKG was normal and that the results of labwork ordered upon Boles' admission to the

hospital had raised no red flags, Boles did experience an episode of asystole (a state of no cardiac

electrical activity) that lasted approximately six seconds.  (Id.).  He did not feel the episode was

cause for great concern, however, hypothesizing that it most likely a side effect from the morphine

given to Boles upon admission to the hospital.  (Id.).  Nevertheless, he wanted to keep Boles in

intensive care for the time being and have an external pacemaker standing by Boles' bedside.  (Id.).

Given Boles' clinical and family history, he also thought it wise to refer Boles to cardiology for an evaluation. (Id.). Finally, he recommended that Boles should continue using a proton pump inhibitor and get addiction counseling. (Tr. 501).

On April 24, 2006, Boles submitted to a psychological examination with Dr. William Stone, a clinical psychologist, at the Social Security Administration's (SSA) behest and in conjunction with a previously filed application for benefits. (Tr. 480).[2] Dr. Stone noted that Bole was cooperative, comported himself in an appropriate manner, and appeared to have good recall. (Tr. 484). Dr. Stone further estimated that Boles intellectual functioning was in the high average range given his use of vocabulary, sentence structure, and comprehension. (Tr. 484).

On May 5, 2006, Dr. Stone formally reported his findings to the SSA. (Tr. 480-86). In the report, he opined that Boles likely suffered from mild depression, ongoing alcohol dependence, and an antisocial personality disorder. (Id.). He went on to express his concerns about Boles' ability to manage money and cultivate relationships on the job. (Tr. 485-86). However, he added that, in his opinion, Boles remained capable of performing basic daily activities, sustaining concentration and attention, understanding and carrying out instructions under ordinary supervision, relating to co-workers and supervisors on a superficial basis, and adapting to ordinary day-to-day environmental changes. (Id.).

On May 19, 2006, Dr. Patricia Newman, a consulting psychologist tasked with assessing Boles' mental residual functional capacity as it pertained to a previously filed application for benefits, issued her finding. (Tr. 563). She was of the opinion that Boles' affective disorders, personality disorders, and substance addiction disorders resulted in a moderate restriction of

---

[2] Boles had apparently filed applications for disability benefits in 1990, 1993, and 2004. (Tr. 33).

activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 573). However, she hastened to add that Boles' condition would not, in her view, preclude him from performing simple unskilled work. (Tr. 582).

On May 22, 2006, Dr. Thomas Calvert assessed Boles' physical residual functional capacity in conjunction with a  previously filed application for benefits. (Tr. 557). Based upon his review of the medical records, Dr. Calvert concluded that Boles ability to push or pull was limited on account of his condition but that he was otherwise capable of occasionally lifting and/or carrying up to twenty pounds, standing and/or walking up to six hours in an eight-hour workday, and sitting up to six hours in an eight-hour workday. (Tr. 558).

On October 7, 2007, Drs. Jack Thomas and Robert W. Bain separately evaluated Boles in conjunction with his current applicable for benefits. (Tr. 648-53, 657-59). According to Dr. Thomas' report, Boles did not have any discernable organ damage, had normal range of motion in his elbows, walked without the support of assistive devices, and  had good reflexes, hip flexion and extension, and grip strength. (Id.). He did, however, have difficulty getting out the exam room's chair,  walked "bent over" as if in pain, and complained of pain throughout the evaluation. (Id.).

 Dr. Bain likewise documented Boles' pain complaints in his report.  (Tr. 648-53). Specifically, Dr. Bain noted that Boles found it difficult to sleep on account of his chronic pain and would often turn to alcohol for relief, drinking "anywhere from 12 cans to three 6 packs on a bad day." (Tr. 650).

Dr. Bain next chronicled Boles' childhood and work history.  According to Dr. Bain's report, Boles was abandoned by biological parents and raised in foster care. (Tr. 648). While in foster care

11

he was subjected to verbal, physical, and sexual abuse. (Id.). He had since found it difficult to trust others. (Id.). He also found it difficult to hold a job for a long period of time. (Tr. 649). His presentation at the evaluation, in Dr. Bain's words, suggested that he was introverted, insecure, and withdrawn. (Tr. 651-53).

Dr. Bain concluded that Boles suffered from major depression, a generalized anxiety disorder, and an avoidant personality disorder. (Tr. 652). Although Dr. Bain was not convinced that Boles suffered from any memory impairments or difficulties maintaining concentration, he acknowledged that Boles' ability to function and tolerate pain would likely have been compromised by depression and anxiety. (Tr. 652-53). Dr. Bain recommended counseling for Boles, reasoning that it could help Boles cope with his declining health, lack of independence, and the symptoms of his depression and anxiety. (Id.). Dr. Bain further recommended that Boles be placed on antidepressants and anti-anxiety medication. (Id.)

On October 19, 2007, Dr. Marlin Johnson, a State agency physician, assessed Boles' residual functional capacity. (Tr. 583-90). Based on his review of Boles' medical records, he concluded that Boles was capable of: lifting and carrying ten pounds frequently and twenty pounds occasionally; standing and/or walking for a total of about six hours in an eight-hour work day; sitting for a total of about six hours in an eight-hour work day; and pushing and/or pulling without limitations. (Tr. 584). He further opined that Boles could occasionally climb, stoop, crouch and crawl. (Tr. 585).

On November 21, 2007, a State agency psychologist, Dr. Harold Hase, completed a "Psychiatric Review Technique" Form. (Tr. 591). Therein, Dr. Hase opined that Boles' depression, affective disorder, anxiety disorder, personality disorder, and alcohol abuse likely resulted in mild

restrictions of his daily living activities as well as moderate difficulties in his social functioning. (Tr. 591).

Boles presented to Medcenter One in June of 2008 with complaints of recurrent chest pain. (Tr. 836, 937-42). An angiogram revealed that he had blockage in his left anterior descending coronary artery. (Tr. 836-37). The artery was ultimately stented and Boles was discharged on Metoprolol, Visinopril, Simvastatin, Plavix, and aspirin. (Tr. 836-37, 869).

Boles was examined by a cardiologist, Dr. Stephen Bernard, on July 17, 2008. (Tr. 952, 954). According to Dr. Bernard's notes, Boles had continued to complain about transient chest pain despite implantation of the stents. (Tr. 954). Dr. Bernhard reassured Boles that his chest pain was likely noncardiac in nature. (Tr. 954-55). He nevertheless adjusted Boles' medications. (Id.). He also urged Boles to quit smoking. (Id.)

On November 11, 2008, Boles was readmitted to Medcenter One with complaints of chest pain, shortness of breath, and nausea. (Tr. 663-65, 670-71, 680, 836). He underwent a cardiac angiogram, during which his right coronary artery was stented. (Tr. 663-65, 670-71, 680, 692-93).

Boles had a followup examination with a physician's assistant, Wanda Knudson, on January 13, 2009. (Tr. 950). Knudson reported that Boles had experienced chest pain within three to four weeks of his most recent angiogram. (Id.). She further reported that Boles had gone without Plavix for thirty days because of financial hardship but was eventually able to obtain free samples from Dr. Thompson. (Id.).

Boles again presented to Medcenter One with chest pain on April 14, 2009. (Tr. 809). Physicians' notes indicate that Boles complained of discomfort but that his initial EKG and enzyme tests were normal. (Tr. 809-813). He underwent another cardiac angiogram, the results of which

indicated that he had some blockage that could be treated medicinally and that he was otherwise normal.  (Tr. 836-37, 956).

On May 19, 2009, Boles was again examined by Knudson.  (Tr. 945).  In her notes, Knudson documented that Boles had not been taking his prescribed medications for financial reasons.  (Tr. 945).  Stressing the importance that Boles take his medications, Knudson indicated that her clinic would work in conjunction with a social worker to see if Boles could be enrolled in an "Indigent Program" to assist him in obtaining his prescribed medication.  (Id.).

Boles returned to the emergency room on June 15, 2009, with chest pains.  (Tr. 780, 793, 800, 805, 823, 828, 832).  X-rays of his heart, lungs, mediastinum, and bony thorax were normal.  (Tr. 780, 793, 828).  He was diagnosed with unstable angina, although his physician hypothesized that his pain could be attributable to small vessel disease and otherwise exacerbated by stress and anxiety.  (Tr. 798, 823-24, 832, 838, 846).

Karen Shea, a vocational rehabilitation expert with the North Dakota Department of Human Services, wrote to the SSA in October 12, 2009, to advise it that Boles' case at Vocational Rehabilitation had been closed and she found it unlikely that Boles would ever be able to reenter the workforce.  (Tr. 436).

### C.    Administrative Hearing Testimony

At the administrative hearing, Boles acknowledged that he had issues with alcohol dating back to his time in the military.  (Tr. 41, 95-96). Specifically, he testified that he regularly binge drank in the hopes that the alcohol would dull his pain.  (Tr. 95-96).  He also admitted to having used methamphetamines in the early-to-mid 1990s.  (Tr. 98).  However, he was adamant he had not used

14

illegal drugs for decades and had abstained from drinking alcohol in the eight weeks prior to his administrative hearing.  (Tr. 95-98).

When queried about his prescription medication, Boles responded that he was currently taking nine prescription drugs, including Lisprinol, Plavix, Meditropinol, and Lexapro. (Tr. 45-47). He added that he was dependent upon the free samples given to him by his physicians she could not otherwise afford to have his various prescriptions filled.  (Tr. 47).

With respect to his ability to work, Boles testified that his social anxiety has made it virtually impossible for him to find and maintain steady employment.  (Tr. 63).  When asked to elaborate, he explained that he was consumed by anxiety and often felt the urge to lash out when around other people.  (Id.).  He went on to testify that he was physically incapable of engaging in any substantial physical activity, insisting that he could not sit for an extended period of time because of the pain, could not stand for more thirty minutes at a time, could not lift and carry more then ten pounds, and often experienced shortness of breath and tightness in his chest when exerting himself.  (Tr. 89-91, 108-10).  Finally, he testified that he suffered from a vision impairment and, although he owns a pair of reading glasses, has found it difficult to read.  (Tr. 110).

Boles' fiancé, Sabrina Stewart, next testified that Boles suffered physically and mentally on account of his impairments.  (Tr. 114-120).  Specifically, she testified that Boles was in constant pain, had difficulty sleeping, suffered from chronic depression, engaged in little physical or social activities, and needed a modicum of assistance to get through the day.  (Id.).

At the conclusion of Stewart's testimony, the ALJ posed the following hypotheticals to a vocational expert: (1) whether Boles could perform any of his past relevant work; (2) whether an individual in Boles' condition who was capable of performing light sedentary work could perform

Boles' past relevant work; and (3) whether an individual in Boles' condition could perform light sedentary work that did not involve interaction with the public. (Tr. 134- 38). The vocational expert responded that, while Boles could not return to any of past jobs, the individuals described in the second and third hypotheticals were, in his opinion, capable of performing some light, sedentary work. (Id.).

### D.   ALJ's Decision

The ALJ issued his written opinion denying Boles' application for DIB and SSI on November 13, 2009. (Tr. 10-22). When reviewing the application, he employed the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520. He quickly dispensed with the first step and acknowledged that Boles had not engaged in substantial gainful activity since October 5, 2004, the alleged onset date of Boles' disability. (Tr. 12).

Moving on to the second and third steps, the ALJ recognized that Boles' condition had more than a minimal effect on his ability to engage in basic work-related activities. (Tr. 13). However, he was not convinced that Boles suffered from an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1 given: (1) the dearth of evidence that Boles either had difficulty ambulating or that Bole's nerve root and spinal cord had been compromised; (2) Boles' ability perform activities of daily living, such as managing money, paying bills, surfing the Internet, shopping for groceries, caring for the family dog, preparing meals, and driving a car; (3) inconsistencies in Boles' testimony; and (4) the results of a consultative examinations. (Tr. 14-15).

At the fourth step, the ALJ opined that Boles possessed the residual functional capacity to perform a range of light work as defined by the applicable regulations. (Tr. 15). Specifically, the

16

ALJ concluded that Boles was capable of performing routine, repetitive tasks in a setting that did not require contact with the public. (Id.). In so doing, the ALJ accepted that Boles impairments could cause the alleged symptoms. (Tr. 16). However, the ALJ was dubious of Boles' statements concerning the intensity, persistence, and limiting effects of his symptoms, stressing that the treatment record for Boles' impairments was "extremely sparse" and that Boles had not consistently follow recommended treatment modalities. (Tr. 17).

The ALJ was particularly critical of Boles' appearance and demeanor at the administrative hearing.

> [T]he claimant's responses while testifying were evasive or vague at times, and left the impression that the claimant may have been less than entirely candid. Also, the claimant appeared to be substantially exaggerating discomfort at the hearing, even in excess of allegations of pain.

(Tr. 17-18). He further opined that Boles: (1) was prone to exaggeration as evinced by his statement that he consumed up to 30 aspirin per day; (2) had not acted in the manner one would expect of a person suffering from severe pain, to wit: he had made no effort at finding a better balance of relief versus the painkiller's side effects; and (3) had exhibited fair exercise tolerance when undergoing cardiac stress tests. (Id.).

The ALJ was not swayed by Boles' assertions regarding his inability to pay for prescribed painkillers in light of the fact that he had demonstrated the ability to obtained needed medications by other means. (Id.).

With respect to the various medical opinions of record, the ALJ afforded significant weight to Dr. Marlin Johnson's physical RFC assessment and Dr. Harold Marlin's mental RFC assessment. (Tr. 19). In contrast, the ALJ discounted the assessment of Dr. Wolf on the grounds that it was

17

somewhat dated when compared to the other medical evidence and based solely upon Boles' subjective complaints, which it uncritically accepted as true.  (Id.).  The ALJ further discounted Karen Shea's vocational rehabilitation assessment–that Boles had multiple barriers to employment too great to overcome–on the grounds that it failed to adequately set forth the basis for its conclusion. (Id.).

Moving on to the fifth and final step, ALJ acknowledged that Boles was unable to perform any past relevant work.  (Tr.  20).  However, the ALJ quickly added that Boles was capable of making a successful adjustment to other work given his age, education, work experience, and residential functional capacity.  (Tr. 21).  Consequently, he concluded that Boles was not disabled as defined in the Social Security Act.  (Tr. 21-22).

## II.   LEGAL DISCUSSION

### A.     Standard of review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review.  Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d 988,  993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   It  is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results.  Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the

18

standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id. Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion. Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993). The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.

**B.     Law governing eligibility for adult benefits**

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act"). 42 U.S.C. § 423(a)(1)(D). To meet this burden, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment. 42 U.S.C. § 423(d)(1)(A)." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

19

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the claimant would be hired if he or she applied for work.  42 U.S.C. § 423(d)(2)(A).  Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id.

In deciding whether a claimant is disabled within the meaning of the Act,  the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1)     whether the claimant is presently engaged in a substantial gainful activity,

(2)     whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)     whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)     whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)     if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations.  20 C.F.R. § 404.1545.  The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations.  Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily

activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id.  In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[3]  E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005).   Claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole.  Pearsall v. Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that are supported by accepted diagnostic techniques and that are not inconsistent with other substantial evidence.  This rule does not apply, however, to opinions regarding disability or inability to work because these determinations are within the exclusive province of the Commissioner.  The Eighth Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. See Randolph v.

---

[3]  In Polaski, the Eighth Circuit approved a settlement agreement with the Secretary of HHS that contained, in part, the following language, which the court stated was a correct statement of the law with respect to the manner in which subjective pain complaints are to be analyzed:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>> 1. the claimant's daily activities;
>> 2. the duration, frequency and intensity of the pain;
>> 3. precipitating and aggravating factors;
>> 4. dosage, effectiveness and side effects of medication; and
>> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. [Emphasis in original.].

739 F.2d at 1322.  The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

Barnhart, 386 F.3d 835, 839 (8th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. See Stormo [v. Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).

. . . .

The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

Ellis v. Barnhart, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner. The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law. 20 C.F.R. § 404.1504. E.g., Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996). And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Pearsall v. Massanari, 274 F.3d at 1217.

## C.    Parties' Motions for Summary Judgment.

Boles seeks reversal of the Commissioner's decision on the grounds that it is not supported by substantial evidence. In so doing, Boles takes issue with the ALJ's assessment of his credibility and residual functional capacity. He further avers that the ALJ erred to the extent that he discounted the findings of Dr. Wolf and the vocational rehabilitation expert.

22

1.      **ALJ's Credibility Assessment**

Boles takes exception with what he perceives as the ALJ's expectation that he "beg, borrow, or steal" his medication.  In so doing he asserts that he could not afford regular treatment and should not have been penalized on account of his indigency.  See Tang v. Apfel, 205 F.3d 1084, 1086 (8th Cir. 2000) (opining that one's " inability to afford medication cannot be used as a basis for a denial of benefits").

The Commissioner counters that Boles is prone to exaggeration as evinced by his inconsistent behavior, the varying accounts of his mental problems, the inaccurate information that he provided in his applications for benefits, and testimony at his administrative hearing.   The Commissioner further avers that Boles has failed to present "supporting evidence" that his failure to seek medical treatment was due to expense.  See George v. Astrue, 301 Fed. Appx. 581, 582 (8th Cir. 2008).  In so doing, the Commissioner stresses that Boles was able obtain free samples of his various medications.  Finally, in reference to Boles' claimed  indigency, the Commissioner ruminates on all of the money that Boles likely spent over the years on beer and cigarettes.

It is apparent from the record that the ALJ's skepticism regarding the intensity and severity of Boles' symptoms hinged in part upon the fact that Boles was not receiving any ongoing treatment for his back.  Between September 2003 and December 2004 Boles sought out the assistance of physicians, physician's assistants, and/or physical therapists at least than ten times for his back condition.  In March 2005 he sought out treatment for insomnia secondary to his back condition. Thereafter, he never sought any additional treatment for his back condition.

As for the instances when Boles had sought out medical assistance for his back condition, the record evinces that he did not always follow through with treatment recommendations.  For

example, he did not keep his appointment with Dr. Wolf on March 13, 2004, his physical therapy was cancelled after he missed several sessions, he did not curtail his smoking or drinking as advised, and he did not consistently take his prescribed medications.

A claimant's failure to obtain treatment often as one could reasonably expect given his assertions of debilitating pain and failure to follow through with prescribed treatment may weigh against his credibility.  See Gulliam v. Barnhardt, 393 F.3d 798, 802 (8th Cir. 2005).  Such failures may be excused, however, if the claimant is unable to pay for medications or schedule regular doctor's appointments.   See Orn v. Astrue, 495 F.3d 625, 637 (9th Cir. 2007) (recognizing that "disability benefits may not be denied because of a the claimant's failure to obtain treatment he cannot obtain for lack of funds"); Ellison v. Barnhart, 344 F.3d 1272, 1275 (11th Cir. 2003) (opining that poverty may excuse noncompliance with prescribed medical treatment); Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) ("To a poor person, a medicine that he cannot afford to buy does not exist"); Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986) (failure to follow prescribed treatment does not preclude reaching the conclusion that a claimant is disabled when the failure is justified by lack of funds); Dover v. Bowen, 784 F.2d 335, 337 (8th Cir.1986).  That being said, it is incumbent on the claimant who asserts indigency or financial hardship to provide some supporting evidence.

Boles has repeatedly claimed that he could neither afford regular treatment nor his prescribed medication.  However, it does not appear from the record that his indigency posed any obstacle to him getting treatment between September 2003 and December 2004.  It likewise did not deter him from seeking out treatment when he began experiencing chest pains.  As for medication, the record evinces that he sought out painkillers from his physicians on more than one occasion and that these

physicians had more often than not provided him with free samples on request.[4]   Additionally, in

May 2009 Physican Assistant Knudson offered her clinic's assistance in getting Boles his prescribed

medication.   Thus the issue of cost aside, it appears that Boles had alternative means at his disposal

to obtain medication.   This ability, when viewed in combination with the lack of meaningful ongoing

treatment of Boles' back condition, Boles' statements to his physicians that the ibuprofen he had

been taking for pain had helped, and work performed by Boles after the alleged onset of disability,

the ALJ could determine that Boles' financial hardship was not enough to justify his failure to seek

medical treatment.   See Riggens v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) ("Although [the

claimant] claims he could not afford such medication, there is no evidence to suggest that he sought

any treatment offered to indigents or chose to forgo smoking three packs of cigarettes a day to help

finance pain medication."); Murphy v. Sullivan, 953 F.2d 383, 387 (8th Cir. 1992) (concluding the

claimant's financial hardship was not severe enough to justify her failure to seek medical treatment

give the dearth of any evidence to indicate that she had sought low-cost treatment or  had been

denied care on account of her financial condition).

It should also be noted that the ALJ's determination was not based solely upon the dearth of

treatment records or failure to adhere to treatment modalities.   Rather, it was also informed by

inconsistencies in the record.   For example, Boles initially testified at his administrative hearing that

he avoided social situations and neither had nor wanted friends.   However, when queried about his

alcohol consumption, he testified that he drank with friends at their houses, his house, and/or local

---

[4]Boles contacted his physicians in Deceember 2008, January 2009, and March 2009 requesting free samples
of Plavix.   The record also evinces Boles and/or his fiancé  approached doctors on more than one occasion to request
pain medication.   Such conduct lends credence to Boles pain complaints.   However, also begs the question why Boles
would make such an effort to obtain prescriptions he had neither the means nor the inclination to fill.

bars.  When asked about the income he had earned  2008, he minimized his activity by stating that he was simply cutting some scrap metal with a friend.[5]

Next, the ALJ noted what he considered to be Boles' tendency to exaggerate his usage of pain medication.  When presenting to his physicians, Boles represented that he had taken excessive amounts of over-the-counter medication to address his pain.  For example, on one occasion he claimed that he was taking up to thirty aspirin per day.  At least one of Boles' physicians had questioned the legitimacy of such a claim.

The ALJ was not swayed by the testimony and third-party function report of Sabrina Stewart.  (Tr. 20).  He found it disconcerting that this Stewart's report parroted a report submitted by Boles and alternated between first and third person.  (Id.).

As for the objective medical records, the ALJ noted that the observations of medical staff were not entirely consistent with Boles claims of debilitating impairments.  For example, when Boles presented to the emergency room with chest pains, it was noted that Boles "[was] a really healthy gentlement."  Following a stress test in January 2006, it was noted that Boles exhibited a fair exercise tolerance.  It was further noted that Boles was a hard worker.  When discharged from the hospital in June 2009, it was noted that Boles was able to handle activity on an "as tolerated " basis.

Courts are loathe to substitute their judgment for that of the ALJ when it comes to issue of the claimant's credibility.  Rather, courts afford great deference to an ALJ's credibility assessments.  Thus, the test is not whether after reviewing all of the evidence, one could reasonably draw a

---

[5]In his brief in opposition to Boles motion, the Commissioner highlights another inconsistency in the record. Boles had stated in a previous application for benefits, at his administrative hearing, on his present application, and to a consulting physician that he had suffered two heart attacks in recent years.  However, the medical records reveal that myocardial infarctions had been ruled in every instance Boles had reported to the emergency room and that his chest pains were attributable to either blockage or anxiety.

different conclusion than that expressed by the ALJ in this case.  Rather, the test is whether there is substantial evidence in the record to support the ALJ's findings.   The undersigned concludes that such support exists in this case.

### 2.   Combined Effects of Boles' Impairments

Boles next contends that the combined effects of his impairments were given short shrift by the ALJ.  Specifically, he asserts that the ALJ failed to consider the x-ray evidence showing disc space narrowing and spondylosis.  The record reveals just the opposite, however.

When assessing Boles residual functional capacity, the ALJ reviewed Boles subjective pain complains as well as the objective medical evidence.  In so doing, he noted: (1) Boles' history of coronary artery disease; (2) Boles' various visits to emergency room; the results of Boles' April 2009 cardiogram and lab work; and (3) he x-rays the MRIs of Boles' knee and back, and (4) Boles' liver panels.  (Tr. 13).  In so doing, he accepted that Boles' degenerative disc disease and bilateral sacrilization at L5-S1 did constitute severe impairments.  (Id.).   He did not feel that these impairments rose to listing level severity, however.  (Id.).

The record further evinces that the ALJ considered Boles' diagnosis of Hepatitis C.  (Tr. 18).  In so doing, he stressed that Boles had never sought treatment for this disease nor otherwise complained of any symptoms of this disease when presenting to the emergency room with chest or back pains.  (Tr. 18).

Finally, the record evinces that the ALJ considered Boles' mental impairments when rendering judgment.  (Tr. 18).  In so doing, he noted that, when evaluated by the consulting physician, Boles appeared oriented in time, place and date, had excellent memory.  (Id.).  He

concluded that the objective evidence simply did not support the near crippling effects described by Boles.  (Tr. 19).

### 3.   Weight Given to Treating Physicians, Consulting Physicians, and Vocational Rehabilitation Experts

Boles next takes the ALJ to task for, in his words, ignoring the finding of Dr. Wolf, the observations of Dr. Jack Thomas, and the opinions expressed by Karen Shea.

The Commissioner counters that the finding of disability it reserved for the Commissioner. The Commissioner further asserts that the ALJ decision to discount the opinions of Dr. Wolf and Karen Shea were justified as neither articulated any specific limitations imposed by Boles' impairments.  Next, the Commissioner asserts that the ALJ's failure to explicitly reference Dr. Thomas' observations does not necessarily mean that such evidence was not considered.  Finally, with respect to Karen Shea, the Commissioner asserts that she does not constitute an acceptable medical source.

### a.   Dr. Wolf

"By rule, the Social Security Administration favors the opinions of a treating physician over non-treating physicians." Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527).  "If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, it will be given controlling weight." Id. (internal citations and quotations omitted).  "If a treating physician's opinion is not given controlling weight because it is not well supported or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given."  Id.  These factors include: the length

of the doctor-patient relationship; the frequency of examination; and the nature and extent of the treatment relationship." Id.

Boles' contact with Dr. Wolf appears to have been sporadic. According to the record, Boles reported to Dr. Wolf on February 26, 2004, to request narcotic pain medication. He did not report as scheduled on March 13, 2004, for a follow-up examination. He next reported to Dr. Wolf for an examination on December 27, 2004. (Tr. 225-54). It was after this examination that Dr. Wolf opined that Boles was permanently disabled.

In the ALJ's eyes, Boles' credibility or lack thereof cast a shadow over Dr. Wolf's report. When reviewing the report, ALJ was struck by the fact that, when concluding that Boles was completely disabled, Dr. Wolf had relied primarily upon Boles' subjective descriptions of his symptoms and limitations (Tr. 19). In so doing, he noted that Dr. Wolf had uncritically accepted Boles' descriptions as true. (Id.). He further noted that Dr. Wolf's report was dated as compared to the other medical evidence of record and that Dr. Wolf had not provided any additional treatment to Boles since rendering his opinion. (Id.). In contrast, he noted that the opinions expressed by the consulting physicians were based upon a longitudinal review of the available medical records and otherwise consistent with the objective medical evidence. (Id.).

The ALJ did not discount Dr. Wolf's opinion out of confusion or lack of information. Rather, he discounted Dr. Wolf's ultimate opinion regarding disability on the grounds that it was based largely on Boles' subjective complaints, which he found inconsistent with the record as a whole, including the objective medical evidence. . See Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008) (stressing that the ultimate finding of disability is reserved for the Commissioner). Thus, Dr. Wolf statement that Boles was, in his opinion, completely disabled is not dispositive.

In summary, the ALJ carefully considered the opinions and assessments of Dr. Wolf.  He gave Dr. Wolf's observations some weight, but discounted them to the extent that he was not persuaded that Boles was so impaired that he could not have engaged in substantial gainful activity. And, to the extent that he did not accord full weight to Dr. Wolf's opinions, he gave reasons that were supported by substantial record evidence.

### b.     Dr. Jack Thomas

Dr. Thomas examined Boles on October 7, 2007.  (Tr. 657-59).  He subsequently reported back to the SSA that Boles exhibited no end of organ damage in his eyes, the vessels, the fingertips, or joints; had good range of motion in his knees, had good flexion and extension in his hips; exhibited good reflexes; could walk without assistive devices; and had grip strength. (Tr. 658).  He further documented Boles' pain complaints, noting that Boles had difficulty arising from the chair in the exam room and walked very slowly.  (Id.).

The ALJ did not explicitly discuss Dr. Thomas or his finding when denying Boles' application for benefits.  Boles seizes upon this, asserting the absence of any reference to Dr. Thomas's report is evidence of the ALJ's failure to appropriately consider the all of the objective evidence.

The fact that the ALJ did not mention Dr. Thomas by name does not necessarily doom his decision, however.  "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."  See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  "An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  Id.

In his decision, the ALJ represented that he had considered all of the objective medical evidence. He went on to discuss in detail the treatment Boles received from Dr. Hoerauf, Boles' physical therapy, the observations of Dr. Rauta and Dr. Walker, Boles' cardiac profile, Boles' MRI results, a liver panel to which Boles had submitted as part of a consultative examination, Dr. Baer's findings regarding Boles' mental impairments, the assessments of Drs. Johnson and Hauge, and the opinions of Dr. Wolf. (Tr. 17-19). Thus, contrary to Boles assertions, it does not appear that the ALJ gave the objective medical evidence short shrift.

### c.   Karen Shea

As noted above, Shea wrote to the SSA on behalf the North Dakota Department of Human Services. Her letter, dated October 12, 2009, states:

> Toby Boles has been an open case at Vocational Rehabilitation since February of 2008. He was determined to be eligible for services in April of 2008.
>
> Unfortunately, because of several issues, an employment plan was never written or put in place. Toby has multiple health issues that would be impossible to manage in a work site. With his physical and mental disabling conditions, it is unlikely that he would be able to participate in the work force to attain substantial gainful activity, even in sedentary types of occupations.
>
> We have closed his case at Vocational Rehabilitation for the above reasons. The multiple barriers are too great to overcome and therefore services likely would not result in employment.

(Tr. 436).

The ALJ afforded no weight to Shea's letter. (Tr. 19). In justifying this decision, he stressed that the letter "[spoke] in general terms and [did] not provide a basis for the opinion, and refer[ed] to 'several issues' involving the claimant that may or may not be relevant to a disability determination." (Id.).

31

First, while Vocational Rehabilitation's determinations are relevant, they are not controlling. See 20 C.F.R. § 404.1504. E.g., Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996). Second, it is not readily apparent from its letter to the SSA what criteria it utilized when assessing Boles' abilities. Finally, as the Commissioner has pointed out, it is unlikely that could be considered an acceptable medical source.[6]

## III.   CONCLUSION

The Commissioner's decision is supported by substantial evidence. Accordingly, Boles' Motion for Summary Judgment (Docket No. 13) is **DENIED** and the Commissioner's motion for summary judgment (Docket No. 16) is **GRANTED**. The Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

Dated this 7th day of October, 2011.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge

---

[6]SSA regulations divide information sources into two main groups: acceptable medical sources and other sources. They further subdivide other sources into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). Other sources: medical sources include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

There are three major distinctions between acceptable medical sources and the others: (1) only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, id., (2) only acceptable medical sources can provide medical opinions, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007), and (3) only acceptable medical sources can be considered treating sources, 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).